## No. 2108.

## T. C. POWERS *v.* THE STATE.

1. JURY LAW—SPECIAL VENIRE—SHERIFF'S RETURN.—In the return of a a sheriff upon a special venire, he set down in a column the names of twelve of the veniremen, and opposite the first name wrote "not found after diligent search." Under this and opposite each of the other names he put ditto marks, to indicate the same return as to them. The defense moved to quash the writ because the return did not, as required by the Code of Procedure, Article 614, state the diligence used to summon the said veniremen and the cause of the failure to do so. The trial court permitted the sheriff to amend his return so as to show that each of said twelve veniremen had moved out of the county or was absent from it. The defense excepted to the overruling of the motion to quash, and also to the amendment of the return, and to the sufficiency of the return as amended. *Held*, that the amendment was properly allowed, and none of the objections are tenable.

2. BILL OF EXCEPTIONS—PRACTICE.—Refusal of reasonable time for the preparation of a bill of exceptions is not material error when it does not

appear that the party was or may have been in any wise prejudiced thereby. His bill of exceptions should show the prejudice or injury.

3. JURY LAW—CHALLENGE FOR CAUSE—PRACTICE.—An exception reserved to the overruling of a challenge for cause is of no avail when it does not appear that the party had exhausted his peremptory challenges, and consequently that an objectionable juror was forced upon him.

4. SAME.—While the jury in a capital case was being organized, and during a temporary absence of the defendant from the court room, a talesman was examined as to his qualifications and was peremptorily challenged by the State. The attention of the court being called to the absence of the defendant, further proceedings were stayed and the sheriff was sent to bring back the challenged talesman. After waiting an hour without avail, the court, over defendant's objection, proceeded with the examination of the remaining talesmen. *Held*, that there was no material error in the action of the court, in as much as there is nothing to indicate that it either did prejudice, or could have prejudiced, any right of the defendant.

5. EVIDENCE—OPINION.—When an emotion, such as fear, anger, and the like, was manifested merely by demeanor or appearances not otherwise communicable, the witness may be allowed to describe its effect upon his mind, even though the effect be opinion. In this case a State's witness testified that the defendant, about two hours before he killed the deceased, put his foot on the foot of the deceased and kept it there for about half a minute after the deceased remarked to him, "that's my foot you are on," and then the deceased pushed the defendant's foot off of his. The State, over defendant's objection, asked the witness whether the defendant put his foot on the deceased's in a jocular or an insulting manner; and the witness replied that he regarded the act as an insult. *Held*, that the question and answer were allowable. Note the sixth subdivision of the opinion of the court for a succinct but lucid exposition of the rules governing this species of testimony.

6. EVIDENCE—MOTIVE.—A State's witness being on the stand, the court, over objection of the defense, allowed prosecuting counsel to ask him if he had not had frequent difficulties with the defendant. The objections of the defense were that the question was irrelevant, incompetent, and calculated to moot the character of the defendant, which he had not put in issue. The trial judge, explaining the bill of exceptions, states that the defendant was "boss" on the witness's ranch, and that the prosecuting counsel announced the object of the question to be to prove that the witness and the defendant had had difficulties, and that the witness had threatened the defendant to discharge him and employ the deceased in his place—thus showing a motive for the homicide, for which purpose alone the question was allowed. *Held* that the explanation shows sufficient reason for the allowance of the question.

7. CONFESSIONS IN ARREST—RES GESTÆ.—If inculpatory declarations of a defendant were *res gestæ*, they are competent evidence against him, notwithstanding they would be incompetent as confessions because he was in arrest when he made them. See the eighth subdivision of the opinion of the court in elucidation of this important distinction.

8. Special Judge—Practice.—The statutes of this State confer upon a special judge "all the power and authority of the judge of said court, during such continued absence or inability (of the regular judge), and until the completion of any business begun before such special judge." Pending the examination of the witnesses in this cause, the special judge before whom it was tried suspended the trial until the night of the succeeding day, and left the county and district. On his return and resumption of the trial, the defense moved to stay the proceedings and discharge the jury, on the ground that the adjournment of the trial was *ultra vires*, and that the departure of the judge from the county and district had terminated his functions and vacated his office. *Held* that the action of the special judge was not *ultra vires* nor in violation of any law; and consequently the motion of the defense was properly overruled.

9. Verdict—Practice.—In this case it is complained that the verdict of conviction was, under order of the court, received and entered on the minutes on the Sabbath day, and that, in the absence of the defendant, the judgment was rendered on the succeeding day. *Held*, that a verdict may lawfully be returned and entered on Sunday, and that the presence of the defendant is not necessary when the judgment of conviction is entered by the clerk.

Appeal from the District Court of Taylor. Tried below before Charles I. Evans, Esq., special judge.

The indictment in this case was presented at the October term, 1886, of the district court of Taylor county, and charged that the appellant, Til C. Powers, on September 20, 1886, of his express malice aforethought, did assault, kill and murder A. J. Eubank, *alias* Jack Eubank, by cutting him with a knife. The trial commenced on October 27, 1886, and resulted in a conviction for murder in the first degree, with the penalty of a life term in the penitentiary.

The first witness for the State was J. A. Eubank, who testified that he was the father of A. J. Eubank, usually called Jack Eubank, now deceased. Deceased was about twenty-four years old, a little over five feet high, and weighed about one hundred and forty pounds. Witness was absent when the deceased died, but saw his body on the twenty-first of September, 1886, which was the next day after his death.

Doctor Richardson testified, for the State, that he lived at Merkel, in Taylor county, Texas. He reached the deceased, at Coggin's saloon, in Merkel, within a quarter of an hour after he was cut. Deceased was wounded in the neck, and his right wrist was cut. The neck wound was on the left side of the throat. It was an incised wound, about an inch and a half deep.

It entered a little behind and under the left ear, and extended downward to the Adam's apple. Immediately behind the ear there was what seemed to be a scratch on the skull. The wound on the neck severed the jugular vein and both branches of the carotid artery. It was about three and a half inches in length. The wound on the wrist seemed pretty deep, and some of the arteries seemed to have been cut. This wound was calculated to disable the arm, and to prevent any use of it. Deceased lived something over an hour after the witness reached him. The neck wound was necessarily fatal. The difficulty occurred about September 20, 1886, in Merkel, Taylor county, Texas, and the deceased died the same day in said county. Witness was about three quarters of a mile from the place of the difficulty when he first heard of it. When he reached there he found Doctor Shangle, who had already tied the artery. Deceased's life was prolonged by the injection of whisky or brandy into his arm. With the jugular vein and both branches of the carotid artery severed, a person would ordinarily die in from nine to thirty minutes. No other wounds or cuts were found on the body or clothing of the deceased. Witness had been a practising physician for seven years, and was practising at Merkel when Jack Eubank was killed.

Doctor Shangle, for the State, testified that on September 20, 1886, he was called to attend the deceased and reached him a few minutes after he was cut. Deceased was lying in Coggin's saloon, with his throat cut. Witness described the deceased's wounds substantially as Doctor Richardson had done, except that he stated that one branch of the carotid artery was only partially severed. After the wound on the wrist was inflicted, the deceased could not have lifted any thing with it. That wound was on the front of the wrist and extended entirely across the arm. When witness reached the deceased the blood from the artery was spurting about three feet; that from the vein was a regular flow. Deceased died from the wound in the neck the same day it was inflicted.

A. W. Thornton, for the State, testified that he was in Merkel on September 20, 1886, on which day Jack Eubank was killed. About four o'clock in the afternoon, which was about two hours before the killing, the deceased and witness were sitting in the doorway of Coggin & Vicker's saloon, in Merkel. Witness was sitting on a chair, and deceased at the door with his left foot on the door sill, and his right leg thrown across his left knee. De-

ceased and witness had been in conversation about half an hour when the defendant rode up to the saloon, dismounted from his horse, passed into the saloon through the door in which the deceased and witness were sitting, and went to the bar and took a drink. He then came to the door and "sorter" leaned against its west side, and placed his foot upon the left foot of the deceased, who was still sitting in the attitude already described. Deceased looked up at the defendant and kindly remarked: "That is my foot you are on there." Defendant made no reply, but remained with his foot on that of the deceased. Deceased, when he made said remark, spoke plainly and loud enough for the defendant to hear him. The remark could have been heard twenty or thirty feet distant. About half a minute after deceased made the remark he pushed the defendant's foot off of his own with his right foot. No words passed. Defendant did not speak to deceased after dismounting from his horse, but left without saying a word after his foot was pushed off by the deceased. At this point the prosecuting attorney asked the witness to "state what was the manner of the defendant at the time he placed his foot on the foot of deceased; was his manner insulting, or was it playful and done in a jocular manner?" The witness answered that, "from the defendant not moving his foot from Eubank's foot when Eubank asked him to do so, I regarded it as an insult." (The defense reserved exceptions to the allowance of this question and the answer, and their competency constitute the gravamen of the ruling formulated in the fifth head note of this report.)

On cross examination the witness said he knew nothing about the relation existing between the defendant and the deceased anterior to the day of the killing. Defendant did not seem angry when he walked into the saloon, nor, so far as witness noticed, did he exhibit any ill will to any one at that time. When he put his foot on that of the deceased he exhibited no ill feeling except the placing of his foot on the deceased's and refusing to remove it when requested. Neither defendant nor deceased appeared to be angry, though the witness did not scrutinize the face of either of them at the time. Deceased seemed to take no offense at what the defendant did. Several persons were at the bar at the time. Dock Grounds was sitting on or near the bar, and Vicker was behind it.

J. G. Jernigan, for the State, testified that he was in Merkel the day Jack Eubank was killed. About half an hour before

that event the witness, the deceased, George Clayton, W. A. Grounds and the defendant, were all standing at the bar in Coggin & Vicker's saloon. Witness and deceased were standing together at the end of the bar, and deceased was drinking lemonade, when the defendant, with a large, three-bladed pocket knife in his hand, came up behind the deceased, reached over his shoulder and drew the knife, which was closed, across his throat, saying as he did so, "you d—d old fool." This occurred about half an hour before the killing.

Cross-examined, the witness said he was not at the saloon when the killing occurred, but was then at Doctor Richardson's, and heard of the difficulty soon after it took place. Neither the defendant nor the deceased seemed angry when the knife was drawn across the latter's throat. Defendant's manner at the time seemed playful. Deceased did not seem to take any offense at defendant's action. He said nothing and witness apprehended no trouble between them. The only thing said or done was the action of defendant with the knife and his remark at the time. Witness is positive that it was a knife, and not a comb, that was drawn by defendant across the throat of the deceased. Witness had known the deceased for several years, and regarded him as a man who would resent an insult, but never knew him to be engaged in any difficulty. Witness saw defendant and deceased together several times on the day of the killing, and noticed nothing out of the way between them. They seemed to be friendly. It is a common thing for cowboys to call each other liars.

George Clayton, for the State, testified that he was at Coggin & Vicker's saloon when Jack Eubank was killed. Three or four minutes before the killing the deceased and Dock Grounds were sitting in front of the saloon, talking, and, as witness understood it, they were disputing about an order which the deceased claimed had been given by Grounds for a jack and a span of mules. The defendant was squatting near the southeast corner of the saloon. The order, as witness understood from the conversation, was given by Grounds on his book keeper, J. Y. Russell, for the benefit of Jim Cooksey, to whom Grounds was indebted, and the mules and jack were to be delivered to the deceased for Cooksey. It seemed that Grounds, who was drinking, either denied giving the order, or that the order had not been delivered to Russell. Deceased said, "Why, Dock, you won't deny giving the order, will you? Uncle Jack Coggin there saw

you give it to me, and he went to your ranch with me, and saw me give it to D. Y. Russell, and saw me get the stock for it. And if D. Y. Russell has'nt got the order, he has either eat it or burnt it." Grounds then said he had no receipt for the stock— that he had no showing for it. Deceased replied, "you don't want any receipt, the order is all the receipt you need; and, besides, your note to Jim Cooksey is credited with eight hundred dollars for the mules and jack."

During this talk between Grounds and the deceased, the defendant was squatted down at the southeast corner of the saloon, whittling, and once he muttered something which the witness did not understand. No one paid any attention to what he said. Witness was leaning against the post at the southeast corner of the saloon, and was closer than any one else to the defendant. Just after the deceased said that Russell either had the order or had eat or burned it up, the defendant interfered in the conversation and said either "I have not seen any such order," or "you did not have any such order." Witness did not remember whether defendant did or did not use an oath in connection with the remark. Deceased turned towards defendant and said: "Till Powers, you are sitting there and telling a G—d d—d lie for Dock Grounds." After some further conversation between them, the defendant got up and said to the deceased: "Come and let us go round here and talk this matter over, and we can settle it in a little while." The deceased said "No, talk it right here." Defendant said "No, come on around here and we can settle this in a little while." Deceased then said: "All right, I will go with you any where." Defendant, as he got up and spoke to the deceased, closed his knife and put it in his pocket. Then they turned around the southeast corner of Chapman's house, about thirty feet from where witness was standing, and there they disappeared from his view in an alley between Chapman's house and Roe's store house. From their manner and actions, the witness did not think they were angry, and he expected no trouble between them. Before defendant invited the deceased to go around the house he got up and walked to the front of Roe's store, some twenty-five or thirty feet distant, and then returned. Witness kept his position at the post, and in about a minute and a half or two minutes after defendant and the deceased left the front of the saloon, he heard some one say "he has cut Jack's throat." Witness then sprung in front of the saloon door, and there saw the deceased

within a few feet of the door, with his throat cut. The blood was spurting from his neck for two or three feet. He came entirely out of the front door of the saloon, and as he reached the door he said: "I am cut; send for a doctor; Til Powers cut me." Witness caught hold of him, laid him on the floor, and told him to keep quiet and not to talk. The deceased, as witness laid him down, asked for a pistol. Witness caught the lips of the wound with his fingers, and tried to hold them together. The blood spurted all over his hands and clothing. Deceased fainted soon after he was laid down, and before the doctor came. He was in his shirt sleeves and had no weapons upon him. He was a medium sized man. Witness stayed with him until he died. The witness first saw defendant after the difficulty when the latter got on his horse in front of the saloon, and loped off towards the railroad.

Cross examined, the witness said he was a merchant at Abilene, and had been supplying Dock Grounds with provisions and things for his ranch. On the Sunday previous to the killing, witness received from Dock Grounds an order telling witness to bring with him on Monday two pocket knives, one of them for defendant and the other for a negro named George. Witness, on the evening of the killing, took the knives with him to Merkel, and delivered them to the defendant, telling him one was for himself and the other for the negro who was bossing for Dock Grounds. Witness reached Merkel about five o'clock in the afternoon, which was about an hour before the killing. When witness saw the deceased with his throat cut, the blood was spurting about three feet a little to the left of front. There was a trail of blood from the north (back) door of the saloon to the front door of the saloon. The blood was spurting at intervals like the beating of the heart.

Re-cross examined, the witness stated that the knife exhibited to him on the stand was in every respect similar to one of the knives delivered by him to the defendant. The knife is known as the "cattle man's knife." It is a large knife with a long large blade, another blade not so long and known as the tobacco blade, and a third and still smaller blade. The knife delivered by witness to defendant was a new knife, never used up to that time.

J. E. Garrett, a confectioner at Merkel, was the next witness for the State. He was standing at the middle post in front of Coggin & Vicker's saloon when Jack Eubank was killed. This

witness gave substantially the same account as the previous witness, Clayton, had given of the colloquy between Grounds, the deceased and the defendant just before the two latter went around Chapman's house. During the colloquy the defendant was sitting down, whittling with the duckbill or tobacco blade of a new pocket knife. Grounds and the deceased were disputing about an order which the latter claimed the former had given on D. Y. Russell for some stock. Deceased told Grounds that he, Grounds, was drinking, and that they could arrange the matter some other time, when he was sober. Grounds first denied that he had given the order, and afterwards admitted that he might have given it, but claimed that the deceased had not given it to D. Y. Russell. Deceased asserted that he had given the order to Russell, and said that if Russell did not have the order he had either burned it or chewed it up. Defendant then spoke up and said he knew d—d well that Grounds had never given deceased any such order, and knew d—d well that "Powers" (evidently meaning Eubank) had never carried any such order to D. Y. Russell. The deceased then said, "Til, you sit here and tell a lie." Defendant then got up and said to the deceased, "Jack, come and go round here with me and we can settle this in a little while." Deceased replied: "Why not talk it here?" The defendant said: "No, come and let's go round here and we can settle this in a little while." Then the deceased got up and they went round the southeast corner of the saloon and disappeared from the witness's view. Within a minute or a minute and a half the witness heard some one say, "he has cut Jack's throat." Witness looked and saw the deceased about the middle of the saloon, he having come in at the back door. He was coming in a trot, with the blood spurting from his neck. He came entirely out of the front door, and Mr. Clayton caught him and laid him down on the floor. As he staggered to the front door he said: "Send for a doctor; Til Powers has cut me." Witness then looked at the back door of the saloon and saw the defendant there with his left hand on the door facing, and in his right hand the knife with which he had been whittling. Witness next saw him running down the railroad on his horse as fast as the animal could carry him. Mr. Coggin and Mr. Vicker pursued and brought him back. Deceased, as he came through the saloon, had on his white Stetson hat; and here the witness identified the hat and also the knife. On the left side of the hat, just behind where it covered the left ear, and

close to the hat band, there is a cut, apparently made with a sharp instrument. The cut extends forward and in a diagonal direction for about a third of the width of the brim, and there an offset is in it as if another wrench of the instrument was required to move it further. From the offset the cut extended diagonally and downwards to the outer edge of the brim. The blood was on the large blade of the knife, not the blade with which the defendant was whittling. When, after the difficulty, the defendant was at the back door of the saloon, he had in his hand the same knife with which he had been whittling, but the largest of the blades was open when he was at the door. When the defendant and deceased went round the house witness did not think they were mad, and he did not pay much attention to them.

Gus Vicker, for the State, testified that he was in his saloon in Merkel at the time of the difficulty, and heard the conversation between Grounds and the deceased. They were disputing about an order. A few days previous, witness saw Grounds sign an order on D. Y. Russell for a jack and a span of mules, which he was to turn over to the deceased for Jim Cooksey. Grounds executed the order in the saloon and turned it over to the deceased. The jack and mules were valued at eight hundred dollars, and were to go as a credit on a note which Grounds had given to Cooksey, and which Doctor Richardson was holding for Cooksey, as witness supposed. After the jack and mules were brought in by the deceased, witness saw Doctor Richardson credit the note with eight hundred dollars, by writing the credit across the back of it. In the colloquy between Grounds and the deceased, in front of the saloon, the deceased wanted Grounds to pay him for going after the stock. Grounds said he had no showing for the stock, and that Cooksey ought to pay deceased for going after it. Deceased said that Cooksey had not employed him to go after the stock, and he did not look to him for his pay; but that he, Grounds, had employed him, and that he looked to him for his pay. Grounds said he had no showing for the stock, and deceased told him he had turned the order over to D. Y. Russell, who was Grounds's book keeper, and that the note had been credited with eight hundred dollars. Grounds said he had given no order, and that no order had been delivered to Russell. Deceased replied that Russell either had the order or had eaten or burned it up. Mr. Coggin, who was sitting by them, spoke up and said: "Dock, you

don't mean to say you never gave any order; I saw you give it."
Grounds then said to Mr. Coggin: "If you say I gave the order,
it's all right." During this time the defendant was sitting at the
southeast corner of the saloon, whittling. When Grounds de-
nied giving the order, defendant spoke up and said something
about the order, or that he did not understand the matter.
Deceased informed him that it was none of his business; that it
concerned Grounds and himself, and that they could attend to
their own affairs. Defendant then got up, walked to the gallery in
front of Roe's store, and then walked back to the saloon. Wit-
ness gave the same account as previous witnesses of what next
transpired, and until the deceased, with his throat cut, came
through the saloon from the rear. It was witness who exclaimed:
"He has cut Jack's throat," as the deceased reached the counter,
leaned against it and said: "Til Powers has cut me; give me a
drink of water." Before witness could get the water, the de-
ceased tottered to the front door, where Mr. Clayton caught him
and laid him on the floor. Just as witness returned behind the
counter he looked to the back door and saw defendant standing
there, with his left hand against the door facing, and his knife
in the same hand. He appeared as though he was coming into
the saloon, and witness picked up a pistol, threw it down on him
and said: "Don't come in here; you have come far enough."
Just then Mr. Coggin ran in and said: "We mustn't let him get
away;" and witness immediately started to the back door at
which defendant had been standing, but when he reached the
door the defendant had got into the alley between Roe's and
Chapman's. As witness reached the north end of the alley he
saw the defendant at his horse, and twice hallooed at him to
halt, or he, witness, would shoot him. Mr. Coggin told witness
not to shoot defendant, and defendant mounted his horse and
loped off. Mr. Coggin jerked the Winchester rifle from Grounds's
horse, jumped on the horse and pursued the defendant. Wit-
ness got a horse and followed, but Mr. Coggin had caught the
defendant before witness caught up with them. Deceased was
in his shirt sleeves and was wearing a white hat, which the
witness here identified. Deceased had it on when he came into
the saloon after he was cut.

On cross examination the witness said he knew defendant
and deceased prior to the difficulty, and had never noticed or
known of any bad feeling between them. Neither of them man-
ifested any ill feeling when they went around the corner of the

saloon. Witness did not remember hearing defendant say that he knew d—d well that Grounds had given no such order.

Other witnesses for the State gave substantially the same testimony as that already narrated respecting the incidents prior and subsequent to the fatal difficulty, and there is no occasion to recapitulate them.

D. Y. Russell, for the State, testified that he was in the employ of W. A. Grounds as his book keeper. Deceased, a few days before his death, came to Grounds's ranch and delivered to witness an order from Grounds for two mules and a jack, and witness turned them over to deceased. The order had since been mislaid; witness had searched for but failed to find it. Cross examined, the witness said that defendant was not a strong man. Witness had heard him complain of his lungs, and had known him to fail to mount horses on the ranch.

W. A. Grounds, the eleventh witness for the State, testified that he was commonly called "Dock" Grounds, and was engaged in the stock business, raising horses, mules and cattle. Defendant was in charge of the witness's ranch as "boss." The deceased and one Casper had formerly had charge of witness's business, and the defendant succeeded them in charge. Witness never talked to any one about discharging the defendant and putting the deceased in his place. Asked by prosecuting counsel if he had not had frequent difficulties with the defendant, and if there was not bad feeling between him and defendant on account of these difficulties, the witness replied that he had had one or two little "spats" with defendant, but that there never was any bad feeling between them. [This question and the answer are the subject matter of the sixth head note of this report.] Witness never told defendant he was going to turn him off and put deceased in his place. Witness was not contributing to the defense of this case, other than what he owed the defendant, but he did not know how much he owed him. "The understanding is that whatever I owe him I am to pay for his defense." Witness liked the deceased and was sorry he was killed; he was a friend of witness and a good fellow. "I like the defendant, too; he is a good fellow." Witness had arranged with deceased to take a herd of cattle up North in the spring. Defendant knew of that arrangement, and said it was all right, and that he would stay at the ranch and deceased could take the herd.

Cross examined, the witness said the defendant was a weak man, and complained about his chest and that his collar bone

was broken. Witness had seen other boys at the ranch saddle defendant's horse for him, because he was weak. Defendant, in the spring of 1886, asked witness to employ the deceased, and said that deceased was a good hand with stock. Defendant told witness to employ the deceased to take the herd, and witness did so.

Perry Chapman, for the State, testified that he lived in a house adjoining Coggin & Vicker's saloon at the time Jack Eubank was killed. Witness's house stood on the lot east of the saloon, and Roe's business house stood on the lot next east of witness. These lots were each twenty-five feet wide, and all the houses front south. The saloon and Roe's house extend to the street, but witness's house sits back from the street about twenty-four feet. It adjoins the saloon on the one side, and on the other side extends to within four feet of Roe's building, and runs north and parallel with Roe's west wall for the distance of twenty-four feet. Between the houses of Roe and the witness there is an alley or pass way four feet wide, leading from the front of witness's house to his back yard. From the south front of witness's house to the street there is an open space, the width of the lot and about twenty-four feet deep. Witness's house is cut into two rooms, the north or rear room being the kitchen, from which a door opens on the east into the four-foot alley. In the north wall of the kitchen there is a slide window, and, at the time in question, the slide was pushed back, and there was nothing to obstruct the view through the window. The door into the alley from the kitchen was open.

About six o'clock in the evening of September 20, 1886, witness and his wife had seated themselves in the kitchen to eat their supper. The table stood against the north wall, and its center reached about the center of the window. Witness was seated on the south side of the table, and near its southwest corner. Just after sitting down his attention was attracted by footsteps coming through the alley on the east of the house. The defendant and the deceased, approaching from the south, came into witness's view in front of the door, defendant being a little in the lead. Just as they got opposite the door the deceased seemed to halt and said: "This is far enough to go; if you want to talk, you can talk here as well as anywhere." Defendant replied: "No, come on around here a little further; we can settle this in a minute," or something to that effect. While they were at the door the defendant had a closed knife in his

hand.  Witness saw no weapons on the deceased or in his hands.  It seemed they had been talking about an order which Grounds had given deceased.  As defendant made the reply to the deceased he started on and the deceased followed him. They proceeded north in the alley until they came into witness's view through the window, and just before they got within the view of witness he heard the deceased say: "Why, Til, you tried to make me out a liar before all those men."  The defendant said: "About what?"  Deceased replied: "About that order that Grounds gave me."  Defendant said that deceased was a liar; that Grounds never gave any order.  Deceased then called defendant a stinking liar.  Just at that time the witness heard the defendant open his knife, and the deceased said: "Would you have the impudence to draw that knife on me?"  Defendant replied: "Yes, and I am not afraid to use it."  Just then the deceased put out his open left hand to shove the defendant off of him, and the defendant then made a raking cut with the knife. Deceased turned around to his left, and witness saw blood spurting from his neck. It was the left side of the neck that had been cut, and it was this first lick with the knife that cut deceased's throat.  This the witness knew, because the blood was spurting from his neck before the defendant got at him again.  An old ax, which had part of its handle broken off, was lying at witness's wood pile, about six or seven feet from where the parties were standing, and, as deceased turned around and witness saw the blood coming from his neck, he went to the ax, stooped down and raised it with both hands.  Defendant followed him, and just as deceased raised the ax the defendant was upon him. Deceased struck the defendant on the head with the ax, but did not seem to have given him much of a blow, for, though it staggered defendant, it did not knock him down.  Deceased, holding the ax with both hands, raised it a second time and again struck the defendant on the head, and knocked him down.  Just as the deceased made this second stroke with the ax, the defendant made an under-cut with his knife at the deceased.  If this cut had taken effect the witness judged, from the position of the parties, that it would have struck the deceased between his waist and his breast.  The defendant and the ax fell together, and the deceased turned and went in a zigzag course to the north door of the saloon.  The blow which knocked defendant down was not a severe one, and he was up again instantly. Witness got up and went out to see what had become of the

parties, and when he reached where the fight occurred he saw the defendant standing at the north door of the saloon, with his left hand against the door facing. He then had the knife in that hand, and witness saw blood upon the blade. Witness stopped when he saw defendant standing at the door, and, in an instant, W. A. Grounds came through the saloon to the door, and said to defendant: "By G—d, you have killed Jack." Defendant replied: "No, I haven't." Grounds said: "Yes, by G—d, you have, and you had better leave." Defendant replied: "Sure enough," and then turned and left. He had to retrace the alley through which he had come, and the next seen of him by witness he was on his horse going rapidly down the railroad. Deceased seemed to be very weak when he picked up the ax. He picked it up with both hands, and each of the two blows he struck the defendant was struck with the side of the ax. There is a good deal more of this witness's testimony in chief, but it is believed that nothing material is omitted.

Cross examined, the witness stated that he was certain that his attention to the parties was first attracted by their approaching footsteps, and not by their voices. The defense here asked witness if at the examining trial he did not testify that his attention was first attracted to the parties by their talking. The witness thought he had not so testified at the examining trial, but said that the transaction was then fresh in his mind, and that, if he did so state at the examining trial, that statement was correct. The record of the examining court being introduced, the witness's testimony on this point was found to accord with the version of the defendant's counsel. The defense asked the witness if at the examining trial he did not state that both the parties were in his plain view throughout the difficulty, except that he could see only a portion of Eubank's body when he stooped to pick up the ax. Witness replied that if he had so stated at the examining trial that statement was true. The record being again introduced the counsel's version was verified. Witness stated that he saw the defendant fall full length on the ground when struck the last time with the ax. Being asked to explain how he could see defendant prostrate five feet from the window when he could not see the point at which the ax was picked up, eight or ten feet from the window, the witness replied that he knew the defendant fell his full length on the ground, because he (witness) saw defendant's full print in the dust. Nothing more of any significance was elicited by the cross examination.

On his re-examination the witness stated that it was an open, space from where the difficulty occurred to the back door of the saloon.

Mrs. Sarah Chapman, the wife of the preceding witness, testifying for the State, gave substantially the same account as her husband of what transpired between the defendant and the deceased in the alley at the time of and immediately prior to their collision. She stated, however, that while they were passing through the alley the deceased twice protested they had come far enough and that the defendant each time insisted on going further.

A. J. Coggin, for the State, gave an account of his pursuit and capture of the defendant. Seeing the defendant mount his horse the witness ran to Dock Grounds's horse, which was hitched close to the defendant's. Witness jerked a Winchester rifle from the saddle, mounted the horse and made close pursuit of the defendant. The pursuit was continuous. Defendant turned to the left and got into a corner formed by some wire fences, and then turned towards town. This enabled the witness to head him off. Witness turned his horse and three times told the defendant to stop or he (witness) would shoot him. Defendant did not stop until the witness, having headed him, had got within thirty or forty feet of him. The distance from there to the saloon was about three quarters of a mile, and not more than five minutes had elapsed since the difficulty occurred. Witness thought it was not that long until the defendant stopped. Defendant had been drinking some, and was then excited and agitated. As he stopped, the witness said to him, "you have killed a friend of mine, and you must go back to town." He replied: "No, I didn't." Witness said: "Yes, you have," and then the defendant said: "If I did kill him nobody saw me do it." (This was the testimony which elicited the ruling formulated in the seventh head note.) During this conversation the witness was sitting on his horse about thirty or forty feet from defendant, who was on his horse. This was the first conversation which passed between witness and defendant, and it occurred as soon as defendant held up his horse, and not more than five minutes after witness saw the deceased at the saloon with his throat cut It occurred before the witness had the defendant to start back to town. After it occurred the witness told defendant to get in front and ride back to town, and he did so. Witness had seen Vicker following defendant through the Chapman alley, and

saw him throw his pistol down on the defendant and tell him to halt; and witness told Vicker not to shoot defendant.

Cross examined, the witness stated that the defendant subsequently said to him: "Uncle Jack, I would not have done you this way; I am a friend of yours and Lewis's," meaning witness's son. Witness replied that he could not help it, and that he, defendant, must go back to town, and witness then took him back to town. Witness and Vicker afterwards took defendant to Abilene and delievered him to an officer. Witness saw defendant mounting his horse, and then mounted Grounds's horse and pursued him.

The State put in evidence the knife of the defendant, the hat worn by the deceased, the axe and a digram of the premises, and rested the case.

The defense first introduced A. J. Coggin and elicited his testimony about the colloquy in front of the saloon between deceased, Dock Grounds and the defendant. Hearing loud talking in front of the saloon the witness and Mr. Flannigan went and sat down by Grounds. As they did so the witness heard Grounds say: "It is not my place to pay it; Cooksey is the man." Deceased said he couldn't go to Cooksey, and that Grounds was the man who employed him to go. Grounds said: "Did you receipt for the mules?" and deceased replied: "I did not have to receipt for the stock; I took the order you gave me and turned it over to D. Y. Russell." Grounds said: "I asked Russell about the order and he said he knew nothing about it." Deceased replied: "If D. Y. Russell has not got the order he has eat or burned it." Defendant then said something, and the deceased replied: "There is no use for you to lie about it; there were several persons present at the time." Witness then asked Grounds if he denied giving the order, and told him that he, witness, had seen him give it to the deceased. Grounds replied: "Uncle Jack, if you say I gave the order it is all right." About that time the defendant came and sat down by witness and said: "Uncle Jack, what will satisfy you boys for going after the mules and jack; will five dollars satisfy you?" Witness told him it would, for he had heard the deceased say he intended to charge five dollars for the trip. Defendant then said he would go and get the money and settle the matter without any fuss about it. He then got up and walked east to Roe's store, and went up on the gallery in front of it, and then turned and came back. Roe's store was about thirty or thirty-five feet

from where the parties were sitting in front of the saloon. When defendant returned from Roe's store he squatted down by witness and said· "I will try to get the money and settle it off." From this point until deceased came through the saloon from the rear, and some one said, "he has cut Jack's throat," the testimony of this witness accorded substantially with that of the State's witnesses. Recurring to his trip to Abilene with the defendant in custody, he stated that he was with defendant nearly all the time from the latter's arrest until their arrival at Abilene, and was certain defendant did not change his clothes during that time. Witness occupied the same seat with defendant on the railroad car from Merkel to Abilene, and he observed no blood on his clothing from the time of his arrest unt.. he was delivered to the officer at Abilene.

Bob Burch, the officer at Abilene to whom the defendant was turned over, testified that he saw no blood on defendant's clothing while he was in witness's custody. Several other witnesses testified that there was no blood to be seen on the defendant's clothes after the difficulty. One of them was J. V. Cunningham, the sheriff of Taylor county, who took the defendant from Abilene to Merkel in a hack, the day after the killing. Before starting and while the witness was hand cuffing the defendant, the latter complained of his left arm, and asked witness not to put the hand cuffs on that arm too tight. Witness saw the arm; it was bruised and swollen. Defendant also complained of his head.

T. C. Short, for the defense, testified that he was at Merkel the day after the killing, and went behind Chapman's house to where the conflict between defendant and deceased had occurred, and there saw a small piece of timber, about an inch thick, two or three inches broad, and about two or two and a half feet long. It lay east and a little north of the north corner of Chapman's house, and a similar piece lay not far from the back door of the saloon. Defendant is a weak man, and complains of his chest and lungs, and said there was something the matter with one of his arms. Before the killing he frequently told witness that his collar bone had been badly mashed. He and deceased seemed to be on friendly terms, and witness knew of no trouble between them.

J. Santos, for the defense, corroborated the other witnesses as to the apparently friendly terms which existed between defendant and the deceased prior to the difficulty. He, also,

observed the piece of lumber behind Chapman's house spoken of by Short.

Doctor John Rodman, for the defense, stated that he was called to see the defendant at the Abilene jail, the day after the killing, and found him complaining of his head and left arm. Two contusions were on his head, and the small bone of his left arm was broken just above the wrist. It was not a serious fracture and required no treatment. The skin was abraded, and the arm was swollen and bruised. The injury to the arm had the appearance of having been inflicted with some light instrument like a stick or plank. The wounds on the head and arm seemed to be fresh.

Cross examined, the witness admitted that the abrasion of the skin of defendant's arm might have been made with hand cuffs, and the fracture of the bone either by a blow with a light instrument or a light blow with a heavy instrument.

John Bowyer, for the defense, verified certain measurements made of the door, windows, table, etc., in Chapman's kitchen, for the purpose, doubtless, of showing the positions of Chapman and his wife during the collision between the defendant and the deceased. This was the last witness introduced by the defense.

In rebuttal the State recalled W. A. Thornton, who testified that he put the manacles on the defendant when the latter was brought back to Merkel from Abilene. Witness chained defendant's feet and wrists with heavy chains, and heard him say nothing about the chains hurting him, nor anything about his arm being broken, but he said that witness pinched him in fastening the chains.

Gus. Vicker and A. J. Coggin, in rebuttal for the State, said they were present when Thornton put the chains on defendant, and the latter made no complaint of the chains hurting him, or about his arm being broken. With this evidence the case was submitted to the jury. The statement of facts covers some fifty pages of the record, and its contents are much condensed in this report.

*Bentley & Bowyer*, for the appellant.

*J. H. Burts*, Assistant Attorney General for the State.

WHITE, PRESIDING JUDGE. This appeal is from a conviction of murder in the first degree, with a life term in the peniten-

tiary assessed for punishment. The record is quite voluminous, containing seventeen bills of exception reserved to matters occurring during the progress of the trial, a motion for a new trial embracing twenty-five specific grounds, and a motion to stay proceedings based upon five grounds. We do not propose to notice, much less attempt to discuss in this opinion all the questions thus raised, but will select for examination only those which we deem worthy of discussion, stating in passing that such as are not discussed have been fully considered and found to be without merit.

1. Of the special venire ordered and selected, twelve of those whose names appeared in the writ were not summoned. In his return upon the writ the sheriff had set down the names of these twelve in a row, one under the other, numbering them from one to twelve. Opposite No. 1, which was the name of C. H. Harlan, was written, "not found in Taylor county after diligent search," and opposite each of the following names, and under the words written opposite Harlan's name, were ditto marks, indicating that the same return as to Harlan was applicable to each of the others. Defendant moved to quash the writ because the return was insufficient under the statute which requires that "if any of those whose names are upon the list have not been summoned the return shall state the diligence that has been used to summon them and the cause of the failure to summon them." (Code Crim. Proc., art. 614.) On a counter motion of the district attorney to that effect, the sheriff was permitted to amend his return as to each of said twelve venire men, the amendment being that the particular juror named had either moved out of or was absent from the county. Bills of exception were saved by defendant to the overruling of his motion to quash, to the amendment of the return, and to the legal sufficiency of the return as amended. None of the objections are well taken; the amendment was proper. (Murray v. The State, 21 Texas Ct. App., 466.)

2. As to the action of the court in overruling defendant's challenges, for cause, and thereby forcing him to use peremptory challenges upon one or more supposed incompetent jurors, suffice it to say the record does not show that defendant exhausted his peremptory challenges, and in consequence had an objectionable juror forced upon the panel, and he has, therefore, no apparent ground for complaint in the premises. (Loggins v. The State, 12 Texas Ct. App., 65; Ward v. The State,

19 Texas Ct. App., 644; I. & G. N. Ry. Co. v. Underwood, 64 Texas, 466.)

3. It is shown by a bill of exceptions that the court refused, after the defendant's first bill, to stop the trial and permit him then and there to prepare, reduce to writing and submit in writing his bills of exception as taken to adverse rulings of the court. We had occasion to review and settle the practice with regard to this matter in Kennedy v. The State, 19 Texas Court of Appeals, 619. It was said "a defendant on trial objecting to any order, ruling or decision of the trial court is entitled (under art. 1358, Rev. Stat.) to time in which to prepare his bill of exceptions, no matter whether he has one or more counsel. But we do not think it was ever intended to hold that a mere refusal to grant time is reversible error *per se* whether defendant was injured or not by the refusal. For though the time may not have been granted him, yet, if he got his bill subsequently it can not be perceived how he could claim that he was injured. In such a case the ruling would amount simply to error without prejudice, which is rarely ever held reversible error. In order to make an exception of this kind available, the exception should show that the refusal of time prevented defendant from preparing and getting the benefit of such a bill as he was entitled to, or that some other material injury was thereby caused defendant; and the bill of which he was deprived, or the injury done, should be shown in the bill of exceptions saved to the refusal to grant time." (See also Roseborough v. The State, 21 Texas Ct. App., 672.) As presented here it is not made to appear that any injury whatever has resulted from the action complained of.

4. During a temporary absence of defendant from the court room, which seems to have been unnoticed at the time by the court, the names of five talesmen summoned upon the jury were called, and one of them (Adams) was examined as to his qualifications, and was peremptorily challenged by the State. When defendant's absence was called to the attention of the court, further proceedings were arrested. After waiting unavailingly for an hour for the sheriff and deputies to bring back Adams, who had left after his discharge, the court, over objections of defendant, had the other talesmen examined and passed upon by the parties in the absence of said Adams. In qualifying this bill of exception, the trial judge says, "Adams was the only juror examined during the absence of defendant, and he, Adams, was peremptorily challenged by the State."

A requirement of our law is that a defendant must be person-
ally present during his trial for a felony (Code Crim. Proc., art.
596), and the requirement has been held to extend to all import-
ant steps of the trial. (Gibson v. The State, 3 Texas Ct. App.,
137; Mapes v. The State, 13 Texas Ct. App., 85.) A selection of
the jury is beyond doubt one of the most important features of a
trial for a capital felony, and we can well imagine how important
it is ordinarily for a defendant to be present during such proceed-
ings. But in any case, when a rule is invoked for non-observ-
ance, there should at least appear some slight reason why it
should have been observed. It is a maxim that as a general
thing, where the reason of a rule fails, the rule ceases to be
obligatory or operative. Now the talesman, Adams, had been
peremptorily challenged by the State. What possible injury
could inure to defendant because the talesman could not be
found and brought back so that the State might again challenge
him in defendant's presence? We confess we can not imagine.
Under the circumstances disclosed, if error was committed it
was manifestly harmless error, for which no just ground of
complaint can lie.

5. After the jury was completed, the absconding and much
desired talesman Adams made his appearance in court, and the
judge called the attention of defendant's counsel to the fact, re-
marking "there he is now, if you still want him." Defendant's
counsel protested against this remark having been made in
presence of the jury. Other remarks were elicited from the
julge by remarks of counsel, and are presented also in the bill
of exceptions. With all respect to the learned counsel, we must
be permitted to say that the exceptions really appear to us to be
r..ther captious, when all the circumstances connected with the
controversy over Adams are taken into consideration. Whilst
the remarks of the judge may have been unnecessary, we are
u iable to see how they could affect the defendant prejudicially.

6. After the State's witness, Thornton, had detailed what he
had seen of the origin of the difficulty between defendant and
deceased, to the effect that Powers, defendant, placed his foot on
t'ie foot of deceased, and that deceased remarked in an audible
voice that might have been heard thirty feet, "that's my foot
you are on," and then shoved Powers's foot off his, the court,
over objections of defendant, permitted counsel for the State to
ask the witness: "What was the manner of the defendant when
he put his foot on the foot of the deceased? Was it done in a

jocular manner, or in an insulting manner?" To which the witness answered: "From the defendant's not moving his foot from Eubank's foot when Eubank asked him, I regarded it as an insult." Defendant's objection was that the question called for and elicited simply the opinion of the witness, and that the witness's opinion was not admissible as evidence.

Mr. Wharton says: "When we enter upon the discussion of the admissibility of opinion (as evidence) we strike a topic which is embarrassed by much ambiguity of terms." * * * "The true line of distinction is this: An inference necessarily involving certain facts may be stated without the facts, the inference being equivalent to a specification of the facts; but when the facts are not necessarily involved in the inference (e. g., when the inference may be sustained upon either of several distinct phases of fact, neither of which it necessarily involves), then the facts must be stated. In other words, when the opinion is the mere short hand rendering of the facts, then the opinion can be given, subject to cross examination as to the facts on which it is based. A fortiori, whenever a condition of things is such that it can not be reproduced and made palpable in the concrete to the jury, or when language is not adequate to such realization, then the witness may describe it by its effect upon his mind, even though such effect be opinion." (Whart. Ev., 2 ed., secs. 509, 510, 511.)

The same author, in a note to section 512, gives upon this subject nearly the entire opinion in Hardy v. Merrill, 56 New Hampshire, 227, from which we make the following extracts, viz.: As a general rule, "opinions of witnesses derived from observation are admissible in evidence when, from the nature of the subject under investigation, no better evidence can be obtained." Again, "in an investigation of mental and psychological conditions—because it is impossible to convey to the mind of another any adequate conception of the truth by a recital of visible and tangible appearances; because you can not, from the nature of the case, describe emotions, sentiments and affections which are really too plain to admit of concealment, but at the same time incapable of description—the opinion of the observer is admissible from the necessity of the case, and witnesses are permitted to say of a person, 'He seemed to be frightened,' 'He was greatly excited,' 'He was much confused,' 'He was agitated,' 'He was pleased.' 'He was angry.' All these emotions are expressed to the observer by appearance of the countenance, the

eye, and the general manner and bearing of the individual—appearances which are plainly enough recognized by a person of good judgment, but which he can not otherwise communicate than by an expression of results in the shape of an opinion." (1 Greenl. Ev., 13 ed., sec. 440 and note on p. 494. See, also, Best on Ev., 585; Dill v. The State, 6 Texas Ct. App., 113; Richardson v. The State, 17 Texas Ct. App., 486; Hardin v. The State, 8 Texas Ct. App., 658; Tompkins v. Toland, 46 Texas, 585. See, specially for collocation of authorities and an able discussion of the subject, Com. v. Sturtevant, 117 Mass., 122.)

Under these rules we are of opinion the question and answer set out in the bill of exceptions were admissible, and the court did not err in so holding.

7. When the witness, W. A. Grounds, was being examined by the State, the court, over objections of defendant, permitted prosecuting counsel to ask the witness "If he (witness) had not had frequent difficulties with defendant?" To which the counsel for defendant objected because the same was irrelevant, incompetent, and calculated to develop and go into the character of defendant, which he had not put in issue. In explanation to the bill of exceptions reserved to the ruling, the learned judge says: "This bill signed with the explanation that the defendant was boss on the ranch of witness, and counsel for State stated that their object was to show that witness had had difficulties with defendant and threatened defendant to discharge him and employ the deceased, Eubank, and thus to show motive for the killing, and for this object alone the court permitted the witness to answer the question." To our minds this explanation is entirely satisfactory, and shows sufficient reason for the admission of the testimony, the object of which was to establish the probable feelings of defendant toward deceased, and to discover and illustrate the motive for his actions at the time of the homicide.

8. Most serious complaint is made of certain testimony of the State's witness, Coggin, permitted to be given in evidence over defendant's objections. The witness Coggin was the party who arrested defendant after the homicide, under circumstances which may be briefly stated, thus: In a very few seconds after the fatal blows had been inflicted, Grounds told defendant "he had killed Eubank, and that he had better get on his horse and leave." Defendant immediately mounted his horse and fled. Coggin, seeing him on his horse running off, and having heard he had killed Eubank, procured a Winchester rifle, mounted an-

other horse and went rapidly in hot pursuit, which pursuit was continuous for a period of not more than five minutes, when he overtook or came upon the fugitive, having gone about three-quarters of a mile. When within thirty or forty feet of defendant, Coggin says: "I told him to hold up; if he did not I would kill him. I told him this two or three times; about the second or third time I told him this he stopped and I held him up." Witness was asked by the prosecution, "What then occurred?" and answered, "I told him he must go back to town then with me; that he had killed Eubank." Counsel for the State then asked witness, "What did Powers say in reply?" to which defendant's counsel objected because defendant was under arrest, and because no predicate had been laid as required by the statute for the admission of confessions of a defendant made under arrest. These objections were overruled, and in answer to the question the witness said: "Defendant said, 'No, I have not killed him.' I said yes, you have, and defendant replied, 'If I have killed him nobody saw me.'"

Our statute relating to or prescribing the rules under which admissions or confessions of a party being in arrest may be used against him (Code Crim. Proc., arts. 749 and 750) have uniformly been construed to embrace all statements, acts or conduct from which guilt might be inferred. (Haynie v. The State, 2 Texas Ct. App., 168; Marshall v. The State, 5 Texas Ct. App., 273; Williams v. The State, 10 Texas Ct. App., 526; Austin v. The State, 15 Texas Ct. App., 388.) That defendant was under arrest, as shown by the circumstances above mentioned, can scarcely be questioned; that an inference of guilt might well be predicated upon his statement, "If I have killed him nobody saw me," will not be denied. And, again, the inference may also be correct that defendant was in fear of his life when he made the statement, and a statement made under such circumstances could not be regarded as voluntary. (Warren v. The State, 29 Texas, 370; Nolan v. The State, 14 Texas Ct. App., 474.)

As confessions or as admissions of fact from which guilt might be inferred, we are of opinion that the objections urged to the admission of the testimony should perhaps be considered well taken. The question, then, is, was the testimony admissible as *res gestæ?* If *res gestæ*, then the evidence was admissible notwithstanding it might not be admissible as a confession or admission, because *res gestæ* is independent of, superior to, and can not be restricted or limited by the rules relating to con-

fessions or admissions made after arrest.    Whilst it is true that declarations made by a defendant in his own favor, unless part of the *res gestœ*, are not admissible for the defense, it is otherwise equally true that when such declarations are part of the *res gestœ* they are admissible either for or against the defendant.    Mr. Wharton says:  "*Res gestœ* are events speaking for themselves through the instinctive words and acts of participants, not the words and acts of participants when relating the events.  *  *  *  *  *   Nor are there any limits of time within which the *res gestœ* can be arbitrarily confined.    They vary in fact with each particular case.  *  *  *  *   They need not be co-incident as to time if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate.    In other words, they must stand in immediate causal relation to the act, and become part either of the action immediately producing it, or of action which it immediately produces.    Incidents which are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act."    (Whart. Crim. Ev., 8 ed., secs. 262 and 263.)    Again he says,  "but we must remember that continuousness can not always be measured by time."    (Id., sec. 264.)   And again,  "instinctiveness is the requisite, and when this obtains the declarations are admissible."    (Id., sec. 691; see also Bradberry v. The State, 22 Texas Ct. App., 273, and Cartwright v. The State, 16 Texas Ct. App., 473.)    We are of opinion the evidence was admissible as *res gestœ*.

9.    It is contended that the special judge presiding erred in "suspending the trial of this cause on the twenty-eighth of October, 1886, until the night of the twenty-ninth of October, 1886, and leaving the county and district in which this cause was progressing," and, as a corollary growing out of this proposition, that it was further error to overrule defendant's motion to stay proceedings and discharge the jury upon his return and attempted resumption of the case.    In the absence of the regular district judge, the special judge had been elected in the manner provided by Revised Statutes, Article 1094 *et seq*.    After the trial of this cause had proceeded as far as the introduction of a portion of the testimony, the special judge, of his own motion, adjourned the court to an hour of the succeeding day, at the expiration of which time he returned and the trial was resumed, over defendant's objection.    It is earnestly argued by counsel

for appellant that this adjournment and going entirely out of the county and district vacated the office and terminated the functions of the special judge, and hence no further proceedings could be taken by him in said cause, and that all such attempted proceedings would be and are absolutely void.

Article 1094, Revised Statutes, supra, after making provision for the election of special judges, thus defines their powers: "and shall have all the power and authority of the judge of said court, during such continued absence (of regular judge) or inability, and until the completion of any business began before such special judge." To the same effect is the provision of the Code of Criminal Procedure on the same subject, viz.: "He (the special judge) shall have all the power and authority of the district judge that may be necessary to enable him to conduct, try, determine and finally dispose of such case." (Code Crim. Proc., art. 572.) Counsel, inferentially at least, concede that such an order of adjournment might legally have been made by the regular judge, a question about which there can be no doubt. Generally the power inheres in all courts to make all such reasonable orders as are necessary to the transaction of its business, subject only to the restrictions imposed by organic and statutory law.

Under a Tennessee statute, conferring powers on special judges, in language identically similar to ours, it was held that a formal order of adjournment for a period of even two weeks was within the jurisdiction of the special judge; and, in that case, a conclusion is reached, which we do not feel called upon to accept or reject, to the effect that if the order was *ultra vires* the court, if actually held at the time designated, would be a court *de facto* and its proceedings valid. (Brewer v. The State, 6 Lea, Tenn., 198.) So, under a Missouri statute, conferring similar powers, it was held that the powers of a special judge continue until the final determination of the cause for which he is chosen, and that a continuance of the cause does not abate them. (Davidson v. The State, 69 Mo., 509.)

It seems to be well settled that a regular judge may adjourn his court from day to day, and that he may do this for purposes of rest and refreshment—no public or private necessity requiring it. For all general purposes a court is considered in session from its commencement until the close of the term. (Barret v. The State, 1 Wis., 156; People v. Central City Bank, 53 Barb., N. Y., 412; Tuttle v. The People, 36 N. Y., 431.) In the case

of Revel v. The State, 26 Georgia, 275, it was held that it was competent for the judge to adjourn his court over to a future day or week, as he might see fit. From these authorities we conclude that the order of adjournment excepted to in this case was not, as contended, *ultra vires,* and therefore the motion based upon it to suspend proceedings and discharge the jury was properly denied.

10. We have examined the charge of the court with reference to defendant's special exceptions thereto, and do not find said exceptions to be maintainable. As far as they suggest errors of supposed omission of essential words, they appear to us to be hypercritical; and, in so far as it is supposed that there was a fatal omission, on account of the failure to charge the jury upon manslaughter and self defense in connection with the facts, we deem it only necessary to say that there is not a particle of testimony which shows the probability of an adequate cause to support manslaughter, and none which raises the issue of self defense.

11. Appellant's bill of exception No. 17 (and the last) sets forth the fact that the verdict of the jury was received by the clerk and entered on the minutes, under order of the court, on Sunday, and that the judgment was rendered thereon upon Monday, and during the absence of the defendant from the court house. That a verdict can be returned and entered upon the minutes on Sunday is now well settled. (Sherman v. The State, 1 Texas Ct. App., 215; McKinney v. The State, 8 Texas Ct. App., 627; Walker v. The State, 13 Texas Ct. App., 618.) Whilst our code provides that a defendant must be personally present on the trial of a felony case, and especially when a witness is re-examined by the jury, and when the verdict is read, (Code Crim. Proc., arts. 596, 698 and 711), we know of no provision which requires his presence at the time the clerk is performing the ministerial act of entering up a judgment in the case after the trial has been finally concluded.

We have endeavored to discuss all the material questions presented on this record, and we have been unable to find any material error requiring a reversal of the judgment. Appellant seems to have had a fair and impartial trial, and one in which all his rights under the law appear to have been accorded him.

Finding no error the judgment must be affirmed.

*Affirmed.*